**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BAYNARD, et al., | : | Case No. 2:14-cv-1367 |
| | : | |
| Plaintiffs, | : | Judge Smith |
| | : | |
| v. | : | Magistrate Judge King |
| | : | |
| COMMONWEALTH INVESTMENTS, LTD., | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

<u>**DEFENDANTS COMMONWEALTH INVESTMENTS, LTD. AND DUQUESNE**</u>
<u>**PROPERTIES, LLC'S CROSS MOTION FOR SUMMARY JUDGMENT AND**</u>
<u>**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

Respectfully submitted,

**/s/ Joseph F. Murray**
Joseph F. Murray, Trial Attorney (0063373)
MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murray@mmmb.com

Stephen D. Williger (0014342)
Holly H. Little (0084054)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
Telephone: 216.566.5500
Fax: 216.566.5800
Email: Stephen.Williger@thompsonhine.com
        Holly.Little@thompsonhine.com

Robert Huff Miller (0076939)
ROBERT HUFF MILLER LLC
100 East Broad Street, 16th Floor
Columbus, OH 43215
Telephone: 614.384.5794
Facsimile: 614.441.9280
Email: rob@roberthuffmiller.com

**TABLE OF CONTENTS AND SUMMARY OF ARGUMENT**

PAGE

I.    INTRODUCTION                                                          1

II.   STATEMENT OF FACTS                                                    2

III.  LAW AND ARGUMENT                                                      4

      A.    *Standard for Summary Judgment*                                 4

      B.    *In 1933, Congress Rendered Unenforceable All Obligations To Pay In    5
            Gold And Amended Said Prohibition In 1977 To Permit Such Obligations
            To The Extent They Were Newly Issued After The Date Of The
            Amendment.*

As a result of a statutory ban in 1933 and an amendment thereto in 1977, only new,

independent obligations entered into or formed after 1977 can require payment in gold.

Because the obligations of the Lease were merely assigned and assumed in 1990 and the

Lease was simply extended as required by its original terms in 2013, any obligation to pay

in gold in the Lease remains unenforceable.

Primary Authority: 31 U.S.C. § 5118(d)(2).

      C.    *The 1990 Assignment Does Not Transform The Language In The 1919    8
            Lease Into An Obligation Issued After 1977 And Therefore Cannot Revive
            Any Obligation To Pay In Gold.*

The 1990 Assignment is merely an assignment of preexisting obligations under the

Lease, which does not constitute a novation. The Assignor was not released, and the Lease

was not extinguished and replaced with a new agreement. Plaintiffs' primary cases all

involved leases that provided that all assignments are novations. The 1919 Lease,

however, specifically provides that it remains binding on lessees and their assigns, meaning

that an assignment is, by definition, not a novation. Therefore, any obligations assumed by

Commonwealth requiring payment in gold are unenforceable because they are not

obligations issued after 1977.

**1.**     ***Plaintiffs Bear The Burden Of Establishing That Nitschke,***    9
 ***Commonwealth, And Lessors All Clearly And Definitely Agreed***
 ***That A New Lease Would Replace The 1919 Lease.***

Primary Authority: *Williams v. Ormsby*, 966 N.E.2d 255 (Ohio 2012).

**2.**     ***The Cases Reviving Gold Clauses Involved Leases That Provided***    10
 ***For Release Of The Assignor In The Event Of An Assignment***
 ***While The 1919 Lease Provides That It Remains Binding On***
 ***Lessees AND Their Assigns And Therefore The Assignor Was Not***
 ***Released And No Novation Took Place.***

Primary Authority: *216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, 540

F.3d 433 (6th Cir. 2008).

**3.**     ***The 1990 Assignment Was Precisely That—A Mere Assignment—***    12
 ***Not A Novation.***

      **a.**     ***The Language Of The 1990 Assignment Is Clear That No***    13
 ***Novation Occurred.***

      **b.**     ***Plaintiffs' "Evidence" That A Novation Occurred Is***    15
 ***Equally Consistent With An Assignment.***

Primary Authority: *Nat'l City Fin. Corp. v. Quinn*, No. 83257, 2004 Ohio App.

LEXIS 2139 (Ohio Ct. App. May 7, 2004).

      **c.**     ***Not Only Is There No Evidence Of A Release Of Nitschke,***    16
 ***There Is No Evidence That Any Party Requested Or***
 ***Offered Such A Release.***

Primary Authority: *Imperial Hotels Corp. v. Dore*, 257 F.3d 615 (6th Cir. 2001).

      **d.**     ***Case Law Is Clear That An Assignment Alone, Without A***    17
 ***Release Of The Assignor, Does Not Constitute A***
 ***Novation—Even Where The Obligee Consents To The***
 ***Assignment.***

Primary Authority: *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944

(S.D. Ohio 2001); *216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433

(6th Cir. 2008); *Braun v. Danter*, No. 74AP-606, 1975 Ohio App. LEXIS 8224 (Ohio Ct. App. May 20, 1975); *Wenner v. Marsh USA, Inc.*, No. 01AP-1211, 2002 Ohio App. LEXIS 2201 (Ohio Ct. App. May 2, 2002).

   **e.**      ***The Case Law Cited By Plaintiffs Does Not Support A Finding Of Novation Under These Facts.***    20

Primary Authority: *Globe Ins. Co. v. Wayne*, 80 N.E. 13 (Ohio 1907); *Sherwin-Williams Co. v. Glenn Paint & Wall Paper Co.*, 6 Ohio Law Abs. 100 (Ohio Ct. App. 1927).

   **4.**      ***Because The Alleged New Lease Agreement That Plaintiffs Claim Constituted The Novation Is Not In Writing And Signed, It Is Barred By The Statute Of Frauds.***    23

Primary Authority: Ohio Rev. Code Ann. §§ 1335.04, 1335.05; *Curtis v. Am. Energy Dev., Inc.*, No. 2000-L-133, 2002 Ohio App. LEXIS 3157 (Ohio Ct. App. June 21, 2002); *Metromedia, Inc. v. Greater Cleveland Reg'l Transit Auth.*, No. 39743, 1979 Ohio App. LEXIS 11970 (Ohio Ct. App. Jan. 11, 1979).

   **5.**      ***The Renewal Is Further Evidence That The Lease Was Not Extinguished By The 1990 Assignment.***    24

Primary Authority: *Meredith v. Rockwell Int'l Corp.*, 826 F.2d 463 (6th Cir. 1987).

   **6.**      ***Plaintiffs Are Barred From Arguing The 1990 Assignment Gave Rise To Their Claims Due To Laches, Waiver, And Statute Of Limitations.***    27

Primary Authority: *EAC Props., LLC v. Brightwell*, No. 10AP-853, 2011 Ohio App. LEXIS 2021 (Ohio Ct. App. May 17, 2011); *State ex rel. Eaton Corp. v. Indus. Comm. of Ohio*, 686 N.E.2d 507 (Ohio 1997); Ohio Rev. Code Ann. § 2305.06.

**D.**    ***The 2013 Renewal Was Merely A Renewal Of The Pre-Existing Obligations—Not A New Obligation.***    27

The Renewal is not a new obligation issued after 1977 because it was required by the terms of the Lease, did not operate to release prior lessees, and did not materially modify the Lease.  Instead, the Renewal merely extended and continued the term of the Lease as the parties agreed in 1919.

    **1.**    ***The Terms Of Both The Lease And The Renewal Are Clear That The Renewal Is Not A New Obligation.***    27

    **2.**    ***The Renewal Is Not A Novation Because Prior Lessees Were Not Released Thereby.***    28

    **3.**    ***The Renewal Is Not A Material Modification That Would Transform It Into A New, Post-1977 Obligation.***    29

Primary Authority: *Hagan v. Cleveland Times Square Holdings/Six Points L.L.C.*, No. 99696, 2013 Ohio App. LEXIS 5336 (Ohio Ct. App. Nov. 21, 2013) *appeal not allowed*, 6 N.E.3d 1204 (2014); *Miles v. Realty One*, No. 69506, 1996 Ohio App. LEXIS 1889 (Ohio Ct. App. May 9, 1996).

**E.**    ***Neither Privity Of Contract Nor Privity Of Estate Constitute Obligations Issued After 1977.***    31

Courts have uniformly held that an assignment alone is not a novation and will not constitute an obligation issued after 1977 necessary to revive a gold clause.  Because every lease assignment and assumption brings the assignee into privity of contract and privity of estate with the lessor, privity alone cannot revive a gold clause.

Primary Authority: *216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, No. 1:06-CV-01288, 2007 U.S. Dist. LEXIS 48298 (N.D. Ohio July 2, 2007).

**IV.    CONCLUSION**    32

## I.    INTRODUCTION

The alleged "gold clause"[1] in the 1919 Lease is not an obligation issued after 1977 and therefore is not enforceable.  This preexisting obligation under the Lease was merely assigned in 1990, and in 2013, the term of the 1919 Lease was extended as agreed by the original parties almost a century ago.  As a result, any claim to require payment of rent in gold pursuant to the Lease is unenforceable pursuant to 31 U.S.C. § 5118(d)(2).

Before this Court is Plaintiffs' motion for summary judgment on claims that the alleged obligations to pay in gold were issued after 1977 and therefore rendered enforceable by virtue of an amendment to the gold clause statute adopted in 1977.  (Doc. 21, the "MSJ".)  Because neither the 1990 Assignment nor the 2013 Renewal revives any alleged "gold clause"—as they are mere assignments and extensions of preexisting obligations, not new obligations issued after 1977—Plaintiffs' MSJ should be denied.  Instead, summary judgment should be entered in favor of Defendants on all of Plaintiffs' claims as the undisputed documents show no obligation to pay in gold was issued after 1977.

The primary cases cited in support of Plaintiffs' MSJ (including *216 Jamaica*) are inapplicable to this case due to a crucial factual distinction: all of them involved leases that provided that *all assignments are novations*, while here, the Lease specifically provides that it *remains binding on lessees and their assigns*.  This distinction—based on the language of the Lease itself—is fatal to Plaintiffs' argument that the Assignment constitutes a novation.  In fact,

---

[1] Pursuant to the Order dated April 14, 2015 (Doc. 25), this briefing is limited to the issues raised in Sections I and II of the Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Doc. 21-1) and the facts relevant thereto.  By not addressing any other facts in this briefing, Defendants are not admitting the same.  As a result, the Court need not now address, and Defendants will not address, whether the language at issue in the Lease is a "gold clause," the interpretation of any such language, or what, if any, obligation any such language imposes.  Moreover, Defendants do not now address the effects of any of their defenses.  Finally, Defendants reserve any other arguments not raised herein.

Plaintiffs have failed to cite a single case enforcing a "gold clause" based on an assignment of a lease that, like the 1919 Lease here, provides that it remains binding on lessees and their assigns.

Defendants concur with Plaintiffs that oral argument would assist the Court in resolving the issues currently before it.

## II.     STATEMENT OF FACTS

All facts material to the matters now at issue are contained within the four corners of four documents:

> Lease (Doc. 7-1, the "Lease" or "1919 Lease");
> Modification of Lease (Doc. 7-2, the "Modification" or "1920 Modification");
> Assignment and Assumption of Lease (Doc. 7-3, the "Assignment" or "1990 Assignment"); and
> Lease Renewal (Doc. 7-4, the "Renewal" or "2013 Renewal").[2]

The issues presently before this Court can be decided on the documents alone. Nothing in Plaintiffs' MSJ nor in any of the documents suggests any ambiguity regarding the issues now before this Court.[3] The documents are clear that the obligations under the 1919 Lease were not extinguished and replaced by a new lease after 1977 but were merely assigned in 1990 and subsequently extended as required by the Lease. While Plaintiffs' MSJ is filled with conjecture and unverified allegations, the only truly material facts are the terms of the parties' agreements—as contained within the four corners of the four documents attached to the Complaint.

Even if the Court finds that the documents are ambiguous and considers additional evidence, the facts and circumstances (as verified by the only party with relevant knowledge of

---

[2] There is no factual dispute concerning the authenticity of these documents, which are attached to Plaintiffs' Amended Complaint (Doc. 7). The relevant terms of these documents, which evidence nothing more than a mere assignment and a mandated extension of the term of the Lease, are discussed in detail in Section III, *infra*.

[3] The intent of the parties is presumed to reside in the language they chose to use in their agreement. *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, Syl., ¶1 (Ohio 1987). Accordingly, a "written contract must be construed and interpreted from its four corners without consideration of parol evidence, i.e., evidence that would contradict or vary the terms of the contract." *Winston Sav. & Loan Co. v. Eastfork Trace, Inc.*, No. CA2001-07-064, 2002 Ohio App. LEXIS 2730, at *5 (Ohio Ct. App. May 28, 2002).

the 1990 Assignment) are consistent with the documents' terms. Furthermore, because no evidence has been produced to verify the alleged "facts" offered by Plaintiffs concerning the states of mind of the parties to the 1919 Lease and 1920 Modification, they must be disregarded.[4]

David Bishoff was intimately involved in the negotiation of the 1990 Assignment and the related transaction and was present at the execution of the 1990 Assignment. Affidavit of David Bishoff, attached hereto as Exhibit 1 (the "Bishoff Aff."), at ¶5. The evidence offered by Mr. Bishoff is uncontroverted as he is the only remaining party that was at the table for the 1990 Assignment. None of the Lessors or Plaintiffs[5] were involved in the 1990 Assignment or related transaction in any way. *Id.* at ¶6. No Lessor or Plaintiff was even made aware of the 1990 Assignment until after the transaction was complete. *Id.* at ¶7. At no time were there any requests for or discussions of any releases of the Assignor ("Nitschke") (or any prior lessees) pursuant to the 1990 Assignment. *Id.* at ¶8. Nor were there any discussions about Commonwealth being responsible for any prior indebtedness under the Lease. *Id.* at ¶9. Neither Commonwealth nor Nitschke ever requested—or even mentioned—a release from the Lessors of Nitschke's obligations under the Lease. *Id.* at ¶10. Likewise, neither Plaintiffs nor Lessors

---

[4] All of the conjecture set forth in support of Plaintiffs' MSJ, including that concerning the intent of the parties nearly a century ago, must be disregarded as no probative evidence—outside of the four corners of the relevant documents—can be offered concerning the same. Plaintiffs' unverified "facts" are not only irrelevant to the interpretation of the documents, but also are completely without foundation or support. For example, on page one of the Memorandum in Support alone, Plaintiffs claim—without citing to any evidence—that the real estate is "valuable," the original lessor "recogniz[ed]" the original rent would not remain reasonable, Commonwealth is reaping an "enormous financial advantage," and the property is "prime." Doc. 21-1 at 1. Plaintiffs go on to offer numerous additional unverified allegations in support of their MSJ including, without limitation, the following: $6,000 annual rent "was a reasonable rate at the time" (*id.* at 2), the original lessor "was no doubt acutely aware of the volatility of the purchasing power of money" (*id.*), the alleged "gold clause" "was designed to protect the parties from the vicissitudes of inflation" (*id.* at 3), the payment of the amount of rent stated in the Lease "amounted to a windfall for the Lessees" (*id.*), the original lessor "bargained to protect his interests against the ravages of future inflation" (*id.* at 4), and the "prime commercial property" is "worth many multiples of [$6,000 per year rent]" (*id.* at 6-7).

[5] It is important to note that all but one of the Plaintiffs was not even a "Lessor" under the Lease at the time of the 1990 Assignment. Doc. 21-2 at ¶2; Doc. 21-3 at ¶2; Doc. 21-4 at ¶2; Doc. 21-5 at ¶2; Doc. 21-6 at ¶2. Thus, the terms "Lessors" and "Plaintiffs" are distinct and not interchangeable and are used intentionally with knowledge of the distinction throughout this brief.

offered, or mentioned, any such release at any relevant time.  *Id.* at ¶11.

The 2013 Renewal was merely an extension mandated by the terms of the Lease.  Doc. 7-1 at 7.  There was no intent to release Nitschke from its obligations under the Lease (or to acknowledge that Nitschke had been so released) in the 2013 Renewal.  Bishoff Aff. at ¶12.

Commonwealth has at all times complied with the terms of the Lease.  *Id.* at ¶13.  From the time of the 1990 Assignment to date, rent has been paid as and when due pursuant to the Lease.  *Id.* at ¶14.  Commonwealth has never received notice of default from any Lessor or any Plaintiff.  *Id.* at ¶15.

The documents and the facts (as sworn by Mr. Bishoff, the only party with relevant knowledge of the 1990 Assignment) are clear that the obligations under the Lease did not arise after 1977 but were merely assigned and extended, as required by the Lease.

## III.    LAW AND ARGUMENT

### A.      *Standard for Summary Judgment*

Pursuant to Civil Rule 56(c), summary judgment shall be granted if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can satisfy its burden by "demonstrate[ing] that the nonmoving party has failed to establish an essential element of [its] case for which [it] bears the ultimate burden of proof at trial."  *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir. 1995) (citing *Celotex*

*Corp.*, 477 U.S. at 322).

The Court must grant summary judgment unless sufficient evidence exists that favors the nonmoving party such that a verdict could reasonably be returned for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* If a party fails to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the Court is required to enter summary judgment. *Celotex Corp.*, 477 U.S. at 322.

Because Plaintiffs cannot establish that any obligation to pay in gold under the Lease was issued after 1977—an essential element of both of their claims—their MSJ should be denied, and, because Plaintiffs bear the burden of proof on the issue of novation, it is Defendants that are entitled to summary judgment.

**B.** ***In 1933, Congress Rendered Unenforceable All Obligations To Pay In Gold And Amended Said Prohibition In 1977 To Permit Such Obligations To The Extent They Were Newly Issued After The Date Of The Amendment.***

Although not dispositive in this case because of the crucial language differences regarding assignments in the leases involved in the Sixth Circuit case and the one at issue in this case, the court in *216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 435 (6th Cir. 2008), explained the history of the ban on gold clauses as follows:

> [I]n 1933, Congress passed a Joint Resolution that declared gold clauses to be "against public policy," barred their inclusion in any future contract and suspended the operation of existing gold clauses by allowing all contract obligations to be paid in paper currency instead. *See* Joint Resolution of June 5, 1933, § 1, 48 Stat. 112, 113 (originally codified at 31 U.S.C. § 463, recodified as amended at 31 U.S.C. § 5118(d)(2)) (providing that no gold clause "shall be contained in or made with respect to any obligation hereafter incurred" and that "[e]very obligation, heretofore or hereafter incurred, whether or not any such provision is contained

therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts").

The Supreme Court upheld the constitutionality of the law invalidating gold clauses. *See, e.g., Norman v. Baltimore & O. R. Co.*, 294 U.S. 240 (1935). Plaintiffs do not dispute that any obligation to pay in gold in the Lease was rendered inoperative by federal law in 1933. Doc. 21-1 at 3.

In 1977, Congress amended the law, providing that new contracts issued after the date of the amendment could require payment in gold:

> Four decades later, Congress changed course. It repealed the ban on private ownership of gold in 1975. And in 1977, it amended the 1933 Joint Resolution, providing that the resolution "shall not apply to obligations issued on or after" the amendment's date of enactment. Act of Oct. 28, 1977, Pub. L. No. 95-147, § 4(c), 91 Stat. 1227, 1229 (originally codified at 31 U.S.C. § 463 note, recodified as amended at 31 U.S.C. § 5118(d)(2)); *see also Trostel I*, 92 F.3d at 738-39.

*216 Jamaica*, 540 F.3d at 435.

At issue here is the meaning of the term "issued." The ban on gold clauses "does not apply to an obligation *issued after* October 27, 1977." 31 U.S.C. § 5118(d)(2) (emphasis added). The word "issued" is intended to mean "entered into." *Rudolph v. Steinhardt,* 721 F.2d 1324

(11th Cir. 1983).[6]  Therefore, the amendment could only render enforceable gold clauses ***entered into after*** its adoption in October 1977.

"Issued" can also mean "formed."  In *Hagan v. Cleveland Times Square Holdings/Six Points, L.L.C.*, No. 99696, 2013 Ohio App. LEXIS 5336, at *11 (Ohio Ct. App. Nov. 21, 2013) (holding that renewal of a lease did not revive the "gold clause") *appeal not allowed*, 6 N.E.3d 1204 (2014), an Ohio appellate court observed that "in 1977, Congress amended the 1933 Joint Resolution to permit the use of gold clauses in contracts ***formed*** after the effective date of the 1977 amendment." (emphasis added).

Both the text of the 1977 amendment and the relevant case law make clear that "issued"

---

[6] In reaching this conclusion, the Eleventh Circuit delved into the legislative history of the amendment in great detail:

> The legislative history to the amendment reveals that the word "issued" was intended to mean "entered into."  Senator Jesse Helms was the author of the amendment which he had originally introduced as S. 79 on January 10, 1977.  At that time, Sen. Helms explained the meaning of the bill's language:  My bill, if approved, will make enforceable, gold clause *contracts entered into* after the enactment of the bill.  It is intended to stand neutral with regard to the enforceability of gold clause obligations issued in the past.  123 Cong.Rec. 635 (1977) (emphasis supplied).

> The bill was ultimately passed by the Senate on Oct. 11, 1977, as a rider to another bill affecting the Treasury Department.  There was no debate of the Helms amendment; and only Sen. Helms explained the meaning of the bill.  At the time, he introduced a letter from Henry Stockwell, Deputy General Counsel for the Treasury Department.  The letter announced the Treasury's consent to the amendment and stated:  Senator Helms' amendment . . . would repeal the Joint Resolution with respect to *obligations entered into* after the date of enactment of Section 4.  123 Cong.Rec. 33,219 (1977) (emphasis supplied).  The House passed the amendment on October 14, 1977, with no debate and only a brief exhortation by Congressman Hansen.  123 Cong.Rec. 33,770 (1977).

> Courts are always reluctant to rely on the position of one Congressman to demonstrate Congressional intent.  However, in this case, the evidence is particularly strong, for the speaker was the author of the bill, there were no other interpretations of the statutory language, and the bill was passed summarily based on Sen. Helms' explanation.  Moreover, his construction of the word "issued" corresponds with its normal meaning in law; debts are normally issued when they are first entered into and made available to the creditor, not when they ultimately come due.  Therefore, we hold that the 1977 amendment to section 463 does not apply to obligations entered into before October 27, 1977.

*Rudolph*, 721 F.2d at 1330-1331.

refers to a ***new obligation***. Therefore, if—and only if—Commonwealth entered into a new, independent, obligation ***after 1977*** to pay Plaintiffs in gold is there any possibility that such a provision is enforceable. Because the obligations of the Lease were merely assigned and assumed in 1990 and the Lease was simply extended as required by its original terms in 2013, any obligation to pay in gold in the Lease remains unenforceable by statute or otherwise.

Plaintiffs miss the point of the statute and the primary issue in this case by focusing on the definition of "obligation." Doc. 21-1 at 8-10. Instead, due to the temporally-specific nature of the statute, the focus is on the verb—"issued"—not the noun—"obligation." The 1977 amendment does ***not*** automatically make enforceable "an obligation" ***assigned*** "after October 27, 1977" or "an obligation" ***renewed*** "after October 27, 1977." *216 Jamaica*, 540 F.3d at 437. The amendment is clear that it applies to make enforceable only "an obligation [to pay in gold] ***issued*** after October 27, 1977." 31 U.S.C. § 5118(d)(2) (emphasis added). Indeed, the Eleventh Circuit recognized this distinction by noting that the date of the original lease was the date when "the lessee ***or his assigns became*** obligated to pay rents on the 99-year lease as they became due." *Rudolph*, 721 F.2d at 1331 (emphasis added). The Eleventh Circuit went on to conclude that none of the obligations under the Lease were issued after 1977 and, therefore, no requirement to pay in gold was enforceable. *Id.* Likewise, any obligations of Commonwealth, as assignee, under the Lease at issue here arose, i.e., issued, in 1919, not after 1977.

### C. *The 1990 Assignment Does Not Transform The Language In The 1919 Lease Into An Obligation Issued After 1977 And Therefore Cannot Revive Any Obligation To Pay In Gold.*

The 1990 Assignment is merely an assignment of preexisting obligations under the Lease, which does not constitute a novation. The Assignor was not released and the Lease was not extinguished and replaced with a new agreement. Plaintiffs' primary cases all involved

leases that provided that all assignments are novations. The 1919 Lease, however, specifically provides that it remains binding on lessees and their assigns, meaning that an assignment is, by definition, not a novation. Therefore, any obligations assumed by Commonwealth requiring payment in gold are unenforceable because they are not obligations issued after 1977.

1. ***Plaintiffs Bear The Burden Of Establishing That Nitschke, Commonwealth, And Lessors All Clearly And Definitely Agreed That A New Lease Would Replace The 1919 Lease.***

The Ohio Supreme Court recently summarized Ohio law regarding novation. In *Williams v. Ormsby*, 966 N.E.2d 255, 259 (Ohio 2012) (emphasis added, citations and quotations omitted), the Court held as follows:

> A contract of novation is created where a previous valid obligation is ***extinguished*** by a ***new valid contract***, accomplished by substitution of parties or of the undertaking, with the ***consent of all the parties***, and based on valid consideration. A ***novation can never be presumed*** but must be evinced by a ***clear and definite intent*** on the part of all the parties to the original contract to completely negate the original contract and enter into the second. Because a novation is a new contract, it too must meet all the elements of a contract.

*See, also, King Thompson, Holzer-Wollam v. Anderson*, No. 93APE08-1155, 1994 Ohio App. LEXIS 147, at *6 (Ohio Ct. App. Jan. 20, 1994); *Citizens State Bank v. Richart*, 476 N.E.2d 383, 385 (Ohio Ct. App. 1984); *Bahner's Auto Parts v. Bahner*, No. 97CA2538, 1998 Ohio App. LEXIS 3453, at *24 (Ohio Ct. App. June 23, 1998) ("The evidence of such knowledge and consent must, however, be clear and definite, because a novation is never presumed."); *Miller v. C.K.L., Inc.*, No. 84 CA 26, 1985 Ohio App. LEXIS 6915, at *4-5 (Ohio Ct. App. July 19, 1985) (to find a novation, the lessor must ***expressly*** agree to release the assignor).

Plaintiffs bear the burden of proving that the alleged gold clause was revived due to novation. "The burden of proving a novation rests upon him who sets it up as a claim." *Braun v.*

*Danter*, No. 74AP-606, 1975 Ohio App. LEXIS 8224, at *9 (Ohio Ct. App. May 20, 1975).

In essence, a novation is the extinguishing of one contract and substitution of a new contract for the extinguished one. "The substitution may be in the debt, debtor or creditor, but there must be ***an unconditional agreement of all the parties*** to the new contract of release, discharge or extinguishment of the former contract and substitution." *Grant-Holub Co. v. Goodman*, 156 N.E. 151, 153 (Ohio Ct. App. Nov. 10, 1926) (emphasis added, quotations and citations omitted). In *Wenner v. Marsh USA, Inc.*, No. 01AP-1211, 2002 Ohio App. LEXIS 2201, at *8 (Ohio Ct. App. May 2, 2002), the Tenth District Court of Appeals ruled that "a novation cannot be accomplished 'without negotiating a common understanding with the other party or parties to an arrangement.' *Livernois v. Warner-Lambert Co., Inc.*, 723 F.2d 1148, 1153 (4th Cir. 1983)."

There is simply no evidence that the parties agreed to extinguish the Lease and establish a new lease. In fact, as demonstrated below, the evidence shows just the opposite. As a result, Plaintiffs' claims fail as a matter of law, and summary judgment in favor of Defendants is warranted.

> **2.    *The Cases Reviving Gold Clauses Involved Leases That Provided For Release Of The Assignor In The Event Of An Assignment While The 1919 Lease Provides That It Remains Binding On Lessees AND Their Assigns And Therefore The Assignor Was Not Released And No Novation Took Place.***

The instant case is unlike the "gold clause" cases in a critical way: Instead of providing that any assignment results in the release of the assignor, i.e., that any assignment constitutes a novation, the Lease here expressly provides that its terms "run with the land, and shall ***extend to and be mutually binding upon*** the respective Lessor and ***Lessees and*** their heirs, executors, administrators, successors ***and assigns.***" Doc. 7-1 at 8 (emphasis added). The Lease does not

even contemplate a release of the assignor in the event of an assignment. In contrast, the leases in the "gold clause" cases cited by Plaintiffs provided that an assignment of the lease automatically released the assignor. Doc. 21-1, § I. The terms of the 1919 Lease, however, make clear that it remains binding on assignors *and* assignees. Doc. 7-1 at 8. Nowhere have the Lessors agreed to release Nitschke from its obligations under the Lease, so, by the terms of the Lease, it remains binding on Nitschke. As a result, no novation could have occurred.

This Lease is materially different from those in cases where post-1977 assignments have revived gold clauses. Every single one of the cases cited by Plaintiffs in support of their argument that the assignment was a novation involved a lease that provided for automatic release of the assignor upon assignment. Under these leases, *every assignment was a novation*. In the Sixth Circuit's case relied on so heavily by Plaintiffs, *216 Jamaica*, 540 F.3d at 437, the court observed that "[n]o doubt, an assignment under Ohio law by itself normally would not establish that a novation occurred" but continued to hold that, because the lease provided that "[a]ll personal liability of the lessees upon this lease and for the performance of the covenants herein contained shall cease and determine upon an assignment hereof," the lease "prohibit[ed] an assignment unless it is a novation."

Indeed, it has been noted with regard to the decision in *216 Jamaica* that, "[a]bsent the automatic release [of the assignor] in the 1912 lease, however, the Court of Appeals may have reached a different result." KUEHNLE & LEVEY, BALDWIN'S OHIO PRAC. REAL EST. (2014), Section 46:8.50. *See, also, Trostel v. Am. Life & Cas. Ins. Co.*, 92 F.3d 736, FN8 (8th Cir. 1998)[7] ("lessors' agreement to the novation arises from a clause in the 1917 lease which provided that the lessee could transfer the leasehold and that upon such transfer the lessee would be released from any personal liability"); *Fay Corp. v. BAT Holdings I, Inc.*, 646 F.Supp. 946,

---

[7] Vacated on other grounds, 519 U.S. 1104 (1997), reinstated by 133 F.3d 679 (8th Cir. 1998).

FN4 (W.D.Wash. 1986) ("Upon a proper assumption by the transferee, the 1929 lease further provided that the assignor would be released from any and all obligations under the Lease…"); *Wells Fargo Bank v. Bank of Am.*, 32 Cal. App. 4th 424, 432 (Cal. App. 1995) ("the 1929 lease itself expressly provided that the lessee 'shall be relieved of all liability accruing under this lease from and after the date of any assignment.'").  The terms of the 1919 Lease dictate that "different result" in this case.

This Lease makes no provision for the release of the assignor, automatic or otherwise.  Instead, this Lease provides that that its terms "run with the land, and shall extend to and be mutually binding upon the respective Lessor and Lessees and their heirs, executors, administrators, successors ***and assigns***."  Doc. 7-1 at 8 (emphasis added).  This provision is the mirror opposite of the provisions relied on by Plaintiffs and courts that have revived gold clauses by virtue of assignment.  This Lease is more similar to the agreement at issue in *Citibank, N.A. v. Gierzak*, No. CA2001-07-177, at *4 (Ohio Ct. App. Feb. 25, 2002), where the court cited a provision in the parties' agreement that noted that each debtor would remain liable and, in finding there was insufficient evidence for a novation, noted the absence of any evidence "in the record to suggest that [the creditor] intended to disregard the … agreement and look solely to [one party] in the event of default."

Because the 1919 Lease expressly provided that its terms would remain binding on "Lessees … ***and*** assigns," Plaintiffs' argument that the 1990 Assignment resulted in a release of Nitschke and thus a novation is contrary to the express terms of the Lease.  Doc. 7-1 at 8 (emphasis added).

### 3. *The 1990 Assignment Was Precisely That—A Mere Assignment—Not A Novation.*

The 1990 Assignment was not a novation because there is no evidence whatsoever that

the parties intended it to constitute a new agreement with the release of Nitschke and the extinguishment of the original 1919 Lease.

      **a.**     ***The Language Of The 1990 Assignment Is Clear That No Novation Occurred.***

There is no evidence whatsoever that all of the parties (or ***any*** of the parties) agreed that Nitschke was released from its obligations under the Lease—and the release of the assignor is an essential element of a novation.[8]

The 1990 Assignment is an agreement between ***only*** Nitschke and Commonwealth whereby Nitschke assigns and Commonwealth assumes the obligations of the Lease. The 1990 Assignment does not contain any language evidencing a release.[9] Had a release from the Lessors been intended, the Lessors would have been made a party to the Assignment because the Lessors would have to agree to any such release as the Lease does not provide for a release of the assignor upon assignment. It is undisputed, however, that not only were the Lessors not a party to the Assignment, they were not even aware of it until after it had been finalized. Bishoff Aff. at ¶¶6-7. This is not unusual because the Lease does not require Lessors' involvement in an assignment. Indeed, only one of the Plaintiffs even claims that he had an interest in the Lease in 1990, and even he does not allege any involvement in the Assignment. Doc. 21-2 at ¶2, Doc. 21-3 at ¶2, Doc. 21-4 at ¶2, Doc. 21-5 at ¶2, Doc. 21-6 at ¶2. Therefore, it could not constitute a release vis-à-vis the Lessors and, as emphasized elsewhere in this brief, the Lessors were not even aware of the assignment until after it was completed, when Commonwealth informed them by letter. Bishoff Aff. at ¶7. The terms of the 1990 Assignment and the evidence offered by the only remaining party thereto are clear that a mere assignment took place, with no mechanism for

---

[8] Indeed, there is no evidence that any of the prior lessees under the Lease were released.

[9] Even if it contained "release" language, neither Commonwealth nor Nitschke had the power to grant such a release, nor is there any evidence that either intended such a release be granted.

or contemplation of a release of Nitschke.

In the 1990 Assignment, Nitschke represents only that it is "the lawful owner of all of the *rights* of the lessees under the Lease." Doc. 7-3 at § 2(a) (emphasis added). Nowhere is it stated or implied that Nitschke is the only party bound by the *obligations* of the Lease. There is no evidence that any of the prior lessees, including Nitschke, has been released.

The 1990 Assignment also includes a representation that Nitschke "is not in default of the performance of any of the obligations of the lessees." *Id*. Notably absent from the Assignment is any representation that Nitschke is the sole obligee or lessee under the Lease. In fact, consistent with the Lease, "lessees" is plural throughout the 1990 Assignment, in reference to the original lessees under the Lease—not to Nitschke, a single entity. Doc. 7-3 at 1.

Commonwealth's agreement in the 1990 Assignment "to perform all of the lessees' covenants and agreements under the Lease to be performed from and after the date hereof" is further evidence that no novation was intended. Doc. 7-3 at § 3. Commonwealth did not agree to a complete substitution for Nitschke, which is an essential element of any novation. Instead, Commonwealth agreed only to perform Nitschke's obligations going forward, and even then, because there is no release of Nitschke by the Lessors, Nitschke remains liable under the Lease. Were Nitschke actually released from any obligations under the Lease, it would have no interest in whether Commonwealth performed under the Lease going forward. Of course, Lessors would benefit from that assurance and agreement, but they were not parties to the 1990 Assignment. Therefore, the only reason an assignor would have any interest in such a provision would be if the assignor remained liable for compliance with the Lease going forward.

Contrary to Plaintiffs' strained interpretation, the 1990 Assignment did not "extinguish[] all of Nitschke's obligations under the lease." Doc. 21-1 at 12. Instead, the Assignment merely

transferred the ***primary*** responsibility for compliance under the Lease to Commonwealth.

**b.** ***Plaintiffs' "Evidence" That A Novation Occurred Is Equally Consistent With An Assignment.***

Plaintiffs rely heavily upon their acceptance of rent from Commonwealth and failure to pursue Nitschke for rent[10] as evidence for a novation. Doc. 21-1 at 16-17. These actions are perfectly consistent with a mere assignment of the Lease. Of course, Plaintiffs looked to Commonwealth alone for payment because they had no reason to look elsewhere as Commonwealth was paying them as required under the Lease. Bishoff Aff. at ¶14. In any event, Plaintiffs' convenient claim that they "elected" not to proceed against Nitschke does not mean that they had no right to do so. And, one need not look beyond the Complaint to reveal why Plaintiffs are not now pursuing Nitschke—doing so would undermine the façade that they attempt to construct to make it appear that the 1990 Assignment was a novation instead of a mere assignment.

The fact that "following the 1990 Assignment, Plaintiffs looked exclusively to Commonwealth for the payment of rent under the lease" is equally consistent with an assignment and, as such, is not evidence that a novation occurred. Doc. 21-1 at 16. Despite Plaintiffs' claim that *Nat'l City Fin. Corp. v. Quinn*, No. 83257, 2004 Ohio App. LEXIS 2139, at *5 (Ohio Ct. App. May 7, 2004) (emphasis added) "***conclude[ed]*** that creditor had consented to a novation … because the creditor 'stopped billing [him] for the loan, stopped accruing interest on the loan, reduced the loan to a zero balance, and wrote off the loan,' even though it never executed a written release," in fact, the court merely held that, given such facts, "reasonable minds ***could find*** that the parties entered into a valid contract of novation." Doc. 21-1 at 16 (emphasis added).

---

[10] Plaintiffs' statement at page 16 of their brief that they "never objected to Nitschke's assignment" is completely undermined by their earlier statement at page 13 that, other than Landis, "the Plaintiffs ***never had any type of contact*** with Nitschke." Doc. 21-1 at 16, 13 (emphasis added).

Furthermore, in *Quinn*, at issue was not whether the contract at issue was assigned or novated, but whether the parties agreed to an oral "walk-away" settlement of their dispute, which included an extinguishment of the loan. *Quinn*, 2004 Ohio App. LEXIS 2139, at *6. In *Quinn*, the actions taken by the parties described above are "evidence that the parties intended to extinguish the old debt and not merely modify the repayment terms of the original note" and, thus, that a novation occurred. *Id.* In this case, however, the fact that Plaintiffs have looked exclusively to Commonwealth for payment is as consistent with an assignment as it is with a novation and, therefore, is not probative evidence that a novation occurred.

### c. *Not Only Is There No Evidence Of A Release Of Nitschke, There Is No Evidence That Any Party Requested Or Offered Such A Release.*

Neither at the time of the alleged novation nor afterwards did any party ever even request that the Lessors release Nitschke from its obligations under the Lease. Likewise, Lessors never offered to release Nitschke. Plaintiffs themselves affirm that none of the Plaintiffs had any contact with Nitschke after the 1990 Assignment. Doc. 21-1 at 13.[11] Because Plaintiffs and Lessors were unaware of the 1990 Assignment until Commonwealth informed them of it after the fact and they did not communicate with Nitschke thereafter, the evidence clearly shows that no agreement to release Nitschke was ever offered by or requested of Lessors. Bishoff Aff. at ¶7.

This utter lack of evidence that Nitschke ever requested or agreed to be released alone is fatal to Plaintiffs' claims. *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 622 (6th Cir. 2001) (noting the importance of a lack of evidence in the record to suggest that the assignor sought a release to the holding that the assignment was not a novation). Indeed, if the Lease is as advantageous to the lessees as Plaintiffs claim, Nitschke would have every interest in remaining

---

[11] Further, none of the Plaintiffs allege they released Nitschke or had any involvement in the 1990 Assignment.

a party to the Lease and retaining the opportunity to cure any default of Commonwealth and retake the Premises. Doc. 21-1 at 3 (claiming, without citing any evidence whatsoever, that the lease is a "windfall for the Lessees"). Plaintiffs cannot prove that all parties *agreed* to a release of Nitschke when there is no evidence that any party even *requested* or *offered* such a release.

### d. Case Law Is Clear That An Assignment Alone, Without A Release Of The Assignor, Does Not Constitute A Novation— Even Where The Obligee Consents To The Assignment.

Courts have consistently held that an assignment alone, absent release of the assignor by the party to whom the obligations are owed, does not constitute a novation. The Sixth Circuit in *216 Jamaica* observed, "No doubt, an assignment under Ohio law by itself normally would not establish that a novation occurred." *216 Jamaica*, 540 F.3d at 437. "A novation differs from the mere assignment of a chose in action, since a novation requires the assent of both parties to the original contract and is, in effect, a new contract between one of the original parties to the contract who remains a party and the new party who is taken in by way of substitution." *Braun*, 1975 Ohio App. LEXIS 8224, at *7 (citations omitted). In *Wenner*, 2002 Ohio App. LEXIS 2201, at *10, the court held that, even though payments were accepted from the assignee, there was no novation because "[t]here was no evidence that appellant agreed to release [assignor] from its liability…."

Ohio real property law affirms that an assignment alone does not release the assignor from its obligations under a lease. "In Ohio, assignment of the lessee's interest in a lease does not relieve the assignor of its contractual obligations unless the lessor substitutes the new lessee with the intent to form a new contract and surrender the old." *Miller v. C.K.L., Inc.*, No. 84 CA 26, 1985 Ohio App. LEXIS 6915, at *4 (Ohio Ct. App. July 19, 1985). In *Gholson v. Savin*, 31 N.E.2d 858, 862 (Ohio 1941), the Ohio Supreme Court held that "when a lease is assigned by the

lessee, the assignee becomes the principal obligor for the payment of the rent thereafter accruing and the future performance of the covenants, and the lessee assumes the position of surety toward the lessor."

Consent to an assignment and assumption by the obligee, together with acceptance of payments and non-pursuit of the assignee upon default does not amount to a novation, as all such actions are as consistent with a mere assignment as with a substitution. *Imperial Hotels Corp.*, 257 F.3d at 622. *See, also, Moneywatch Cos. v. Wilbers*, 665 N.E.2d 689, 691 (Ohio Ct. App. 1995) ("In this case, it is undisputed that both parties agreed to the substitution of the corporation in place of appellant as tenant on the lease. However, there is no clear and definite intent on appellee's part to create a new contract through novation."); *Wenner*, 2002 Ohio App. LEXIS 2201, at *9 ("While the trial court was correct in concluding that a party's knowledge and consent to a novation may be implied from circumstances or conduct, we do not agree with the trial court's conclusion that appellant's acceptance of ITC as his new 'paymaster,' coupled with his implied assent to the assignment through his failure to object to the assignment, established that appellant had knowledge of and agreed to discharge appellee, thereby creating a novation."); *Morse & Hamilton Ltd. Pshp. v. Gourmet Bagel Co.*, No. 99AP-1253, 2000 Ohio App. LEXIS 4492, at *5-6, (Ohio Ct. App. Sept. 29, 2000) ("the lessee's liability continues notwithstanding the lessor's consent to the assignment or acceptance of rent payments from the assignee"); *Colony by the Mall v. Duckro*, No. CA 6169, 1979 Ohio App. LEXIS 8802, at *6-7 (Ohio Ct. App. June 29, 1979) ("Under the assignment mechanism, the lessee does not thereby escape liability on the covenant still extent [*sic*] by virtue of privity of contract. Therefore, in no sense is the assignment of a lease and consent thereto to be regarded as a new leasing or novation. Principally, there is merely a rearrangement of roles with regard to the original lease. The

assignee assumes the position of principal obligor for rentals accruing under the lease and the assignor acts as a surety.").

In *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 951 (S.D. Ohio 2001), this Court granted summary judgment, finding that no novation occurred, based on evidence that the assignment occurred without the prior knowledge of the obligee because absent prior knowledge, consent to a substitution of parties is impossible. In *Wilkes*, the defendant/assignor asserted that because a novation occurred, it was absolved of any liability to pay commissions to the plaintiffs pursuant to a commission agreement. The defendant/assignor assigned, and another company assumed, its liability for commissions to plaintiffs. *Id.* at 947. Plaintiffs were not informed of the assignment prior to its execution, and no one requested that plaintiffs release defendant/assignor or otherwise consent to a new agreement with the assignee. *Id.* Just two weeks after the assignment, however, plaintiffs met with the assignee's owner, accepted promissory notes for payment of the commission amounts from assignee, and continued to earn commissions while representing the assignee. *Id.* When the assignee filed for bankruptcy, plaintiffs filed claims against the estate but received no payment, so they sued the defendant/assignor for the commission amounts. *Id.* Despite the subsequent knowledge of the assignment and the promissory notes accepted by the plaintiffs from the assignee for the commission due by the defendant/assignor, this Court entered summary judgment in favor of plaintiffs finding no novation occurred. This Court held the defendant/assignor liable for payment of the commissions because "neither [of the plaintiffs] consented to have [assignee] substituted for [defendant/assignor] as the party responsible for paying the commissions owed them by [defendant/assignor]." *Id.* at 951.

Ultimately, the facts and the language of the 1990 Assignment are clear that, regardless

of whether Lessors consented to the 1990 Assignment, there was no release of Nitschke and, therefore, no novation.

### e. The Case Law Cited By Plaintiffs Does Not Support A Finding Of Novation Under These Facts.

All of the cases cited by Plaintiffs in support of their argument that a novation occurred are readily distinguishable and do not disturb the well-established case law cited above that supports the conclusion that the 1990 Assignment was not a novation.

*Globe Ins. Co. v. Wayne*, 80 N.E. 13 (Ohio 1907) is inapposite because, while it used the term novation, the issue therein was not whether the assignor was *released* from its obligations, but rather whether the assignee was *bound* by the obligations relating to a common elevator that benefitted the property. While the court in *Globe Ins.* used the term "novation," the actual, controlling analysis was not one of novation, but whether the assignee also assumed the obligations under the contract that was assigned. There was no discussion whatsoever as to the continuing liability or release of the assignor, Union Insurance Company. Additionally, of central import to the *Globe Ins.* court was that the assignee was a member of the board of directors of the assignor. *Id.* at 16. In other words, there was a near-identity of the parties, a fact that is absent in the present case. Due to the dissimilarity of facts and analysis, *Globe Ins.* is not analogous to this case, and its holding is not germane to the matters at issue herein.

*Sherwin-Williams Co. v. Glenn Paint & Wall Paper Co.*, 6 Ohio Law Abs. 100 (Ohio Ct. App. 1927), is completely distinguishable from the facts presently before this Court. *Sherwin-Williams* involved a partnership (the original obligor), a corporation *formed by the partners of the partnership* to "carry[] on the former business of the partnership" (the substituted obligor), and the obligee/creditor who was the plaintiff. *Id.* The finding that a novation occurred was upheld because representatives of *all three parties* met and discussed the transaction "to a

considerable extent," including the fact that the corporation was formed by the partners to "carry[] on the former business of the partnership" and the desire to continue to do business. *Id.* At that time, the corporation was substituted for the partnership on the books of the obligee. *Id.* After that initial conference, the corporation/substituted obligor received "statements of account, containing the note of the [prior obligor] as previously given as an item of indebtedness of the corporation." *Id.*[12]

In contrast, Nitschke and Commonwealth are unrelated entities. Bishoff Aff. at ¶8. There was no meeting whatsoever with Lessors concerning the 1990 Assignment, nor did Lessors have any foreknowledge of the same. *Id.* at ¶¶6-7. Most importantly, there were no discussions or agreements that any prior indebtedness under the Lease would be Commonwealth's responsibility. *Id.* at ¶9. To the contrary, the 1990 Assignment is clear that Commonwealth assumed only the obligations of the lessees under the Lease going forward from and after the date of the assignment. Doc. 7-3 at § 3. Nitschke remained primarily liable under the Lease for any and all obligations predating the 1990 Assignment and liable as surety for any and all obligations (for which Commonwealth assumed the primary responsibility) after the 1990 Assignment. Therefore, there was not a complete substitution of parties or agreements, which is an essential element of a novation.

*Jarmusch v. Otis Iron & Steel Co.*, 13 Ohio Cir. Dec. 122 (Ohio Ct. App. 1901) is equally distinguishable. In *Jarmusch*, the parties being substituted were clear and unambiguous that they intended a novation. *Id.* The intent of the transferor and transferee of the contract was not at

---

[12] It is also important to note that as a court of appeals reviewing a trial court's factual finding, the issue was not whether a novation occurred, but rather whether the trial court's finding that a novation occurred was not "against the manifest or decided weight of the evidence." *Id.*

issue, only whether the beneficiary of said contract consented to the substitution. *Id.*[13]

In the present case, not only is it clear that neither Nitschke nor Commonwealth intended the Lease to be novated, there is also no evidence of any intent for a release of Nitschke by Lessors. In fact, the record is completely devoid of any request for a release by Nitschke or offer of a release by Lessors.

Plaintiffs rely upon *McGlothin v. Huffman*, 640 N.E.2d 598 (Ohio Ct. App. 1994)[14] for the proposition that failure to object to an assignment constitutes consent to novation. Doc. 21-1 at 16. The evidence of consent to novation in *McGlothin* went far beyond the mere failure to object. The promissory note at issue was executed in connection with a partnership agreement. *McGlothin*, 640 N.E.2d at 599. The assignor assigned her interest in the note only days after closing due to a conflict of interest. *Id.* Then, only a few months later, the assignor informed the payee of the note that the assignee would be unable to meet the terms of the note. *Id.* at 599-600. Afterwards, the payee and the assignee entered into ***three additional partnership agreements***. *Id.* at 600. The assignor was not a party to any of these partnership agreements. *Id.* Based on these unchallenged facts, the court upheld the trial court's finding that a novation occurred. *Id.*

Plaintiffs' argument is not only unsupported by *McGlothin*, but it also conceptually presupposes that all assignments are intended to effect full substitutions of one contract for another with an extinguishment of the assignor's contract and all rights and obligations thereunder. Clearly, the norm is that not all assignments have that intent. *216 Jamaica*, 540 F.3d at 437 ("No doubt, an assignment under Ohio law by itself normally would not establish that a novation occurred."). Here, the Lease expressly states that its terms "***extend to and be mutually***

---

[13] Additionally, the *Jarmusch* court was merely reviewing the trial court's decision and, therefore, was not engaged in weighing the facts. *Id.*

[14] Again, the *McGlothin* court was not sitting as a trier of fact and merely held that the "trial court's conclusions were not against the manifest weight of the evidence." *Id.* at 245, 601.

*binding upon* the respective Lessor and *Lessees and* their heirs, executors, administrators, successors *and assigns.*" Doc. 7-1 at 8 (emphasis added). Additionally, the *Wenner* court expressly rejected the argument that "because appellant did not raise any objections to the terms of the assignment, he, therefore, demonstrated his assent, intention, and agreement to release appellee." *Wenner*, 2002 Ohio App. LEXIS 2201 at *8.

> **4.** **Because The Alleged New Lease Agreement That Plaintiffs Claim Constituted The Novation Is Not In Writing And Signed, It Is Barred By The Statute Of Frauds.**

By alleging that a novation occurred by virtue of the 1990 Assignment, Plaintiffs claim that Lessors and Commonwealth entered into a new agreement that requires payment in gold. It is undisputed that there is no written agreement between Lessors and Commonwealth relating to the novation that Plaintiffs allege resulted from the 1990 Assignment. Even if the parties agreed to a new lease to replace the Lease, it is ineffective and unenforceable because it fails to comply with Ohio's Statute of Frauds. OHIO REV. CODE ANN. §§ 1335.04, 1335.05. "[A] novation is subject to the same requirements or rules as any other contract and must meet the same formal requirements as a new contract." 58 AM. JUR. 2D *Novation* § 8.

In *Curtis v. Am. Energy Dev., Inc.*, No. 2000-L-133, 2002 Ohio App. LEXIS 3157 (Ohio Ct. App. June 21, 2002), an Ohio appellate court affirmed a ruling that a novation could not have occurred because the lease fell within the statute of frauds and the document that allegedly effectuated the novation failed to meet the requirements thereof. *See, also, Power-Tek Solutions Servs., LLC v. Techlink, Inc.*, 403 F.3d 353 (6th Cir. 2005) (applying Michigan law and holding that novation must be in writing by statute); *Mannix v. County of Monroe*, 348 F.3d 526 (6th Cir. 2003) (applying Michigan law); *NCUA Bd. v. Marinac*, No. 1:10 CV 2505, 2012 U.S. Dist. LEXIS 164896, at *13 (N.D. Ohio Nov. 19, 2012) (granting summary judgment declining to find

a novation due to lack of a written agreement where one was required by 12 U.S.C. § 1787(p)(2)).

In *Metromedia, Inc. v. Greater Cleveland Reg'l Transit Auth.*, No. 39743, 1979 Ohio App. LEXIS 11970, at *19 (Ohio Ct. App. Jan. 11, 1979), an Ohio appellate court overturned the trial court's enforcement of an agreement that would have been a novation if signed for failure to comply with the Statute of Frauds. The court noted that "[s]ince the proposed agreement had a term in excess of one year and was a totally distinct contract from the 1973 advertising contract [and thus was a novation], the Statute of Frauds was applicable and required a signed written document. Although written, the proposal was unsigned. Therefore, it could not be enforced…." *Id.*[15]

Therefore, Plaintiffs' argument that (either through word or deed) Commonwealth and Lessors somehow entered into a new post-1977 lease obligation is without merit, for any such agreement would be void due to the Statute of Frauds because there is not a writing to that effect signed by Commonwealth, Lessors, or Nitschke.

### 5. The Renewal Is Further Evidence That The Lease Was Not Extinguished By The 1990 Assignment.

The undisputed facts make clear that the 1990 Assignment was merely an assignment in which Lessors had no involvement and that there was no agreement to release Nitschke, extinguish the Lease, and establish an altogether new agreement. The Renewal confirms as much. If the 1990 Assignment brought about an entirely new, substituted agreement between Commonwealth and Lessors, then that new agreement, not the 1919 Lease, would have been the

---

[15] Ohio courts have held that a subsequent oral agreement that varies an essential term of a written contract required to be in writing by the Statute of Frauds is invalid and unenforceable. *Franke v. Blair Realty Co.*, 164 N.E. 353 (Ohio 1928); *Grossman v. McNutt*, No. 88AP-698, 1989 Ohio App. LEXIS 3789 (Ohio Ct. App. Sept. 26, 1989). Certainly, whether the full interest in the Lease had been transferred and a new contract reached with a full and complete substitution of lessees is essential and must be in writing.

subject of the Renewal. Instead, the Renewal **_contains no specific reference whatsoever to the 1990 Assignment_**.[16] The focus and subject of the Renewal is the 1919 Lease—not the 1990 Assignment or some other alleged new agreement between Commonwealth and Lessors.

The Renewal's boilerplate authority language—entered into twenty-three years after-the-fact—does not transform the 1990 Assignment into a novation. Commonwealth's representation that "it is the current Lessee under the Lease, that no other lessee party or parties have any rights, obligations or interests under the Lease, and that it has full right and authority to execute and deliver this Renewal" is nothing more than standard, boilerplate language for verifying its authority to execute the Renewal. Doc. 7-4 at ¶3. Notably, the parties signing the Renewal as "Lessors" make the identical representation with regard to authority. *Id.* In other words, Paragraph 3 is merely an acknowledgement by all parties to the Renewal that the proper parties are executing the Renewal. There is no evidence whatsoever that by this language, Commonwealth intended to somehow agree to an extinguishment of the Lease and a release of Nitschke. Bishoff Aff. at ¶12.

Furthermore, a mere representation by Commonwealth cannot alter the rights and obligations of Nitschke vis-à-vis the Lessors. It is undisputed that Lessors were neither a party to nor involved in any way with the 1990 Assignment. *Id.* at ¶6. The intent of this language was not to establish that Nitschke was released, but simply that Commonwealth was the proper party to sign the Renewal. *Id.* at ¶12. Even if this language is [incorrectly] interpreted as a representation by Commonwealth that Nitschke was released, the representation is simply false because the undisputed facts establish that the Lease did not provide a method for release of a prior tenant, the 1990 Assignment did not release Nitschke's obligations vis-à-vis the Lessors,

---

[16] The note that the Lease had been "previously modified and assigned" refers not only to the 1990 Assignment, but also to the "several times" that the Lease was assigned throughout the years (and to the 1920 Modification). Doc. 7-4 at ¶A; Doc. 21-1 at 3.

the Lessors never consented to any such release, and no writing establishes a new agreement between Lessors and Commonwealth, as required by the Statute of Frauds.

Regardless, this argument and all of Plaintiffs' arguments allegedly establishing that the parties consented to a novation years, or decades, after the 1990 Assignment are irrelevant because all parties' consents and agreements to the novation must occur ***at the same time***. In *Meredith v. Rockwell Int'l Corp.*, 826 F.2d 463, 465-466 (6th Cir. 1987) (emphasis added), the Sixth Circuit was clear that concurrent consent and understanding of a full substitution of the new agreement for the old by all parties at the time of the alleged novation is required, noting that, under Ohio law, "[t]he evidence of a novation, therefore, may be implied, but under applicable Ohio law clear and definite evidence must show mutual consent and a common understanding ***at the time of novation***." *See, also, Scioto Savings Ass'n v. Porter*, No. 77AP-788, 1978 Ohio App. LEXIS 10229 at *2-3 (Ohio Ct. App. Mar. 2, 1978) (internal citations and quotations omitted, emphasis added) (in order to establish a novation, "not only must there be an obligation that is extinguished but that … the parties ***at the time the novation took place*** intended a novation and both parties consented thereto"). Therefore, Plaintiffs' focus on what happened in the years after the alleged novation is misplaced as, under Ohio law, only the parties' intent and understanding ***at the time of the alleged novation*** is relevant, and it is undisputed that Lessors were unaware of the 1990 Assignment at the time it was negotiated and signed.[17]

---

[17] In *216 Jamaica Avenue, LLC*, 540 F.3d at 438-439, the Sixth Circuit rejected the notion that the lessor's consent to the assignment could not be given prior to the assignment (i.e., in the original lease) and proceeded to note that it could not identify an Ohio court that embraced the requirement that all parties' consent to a novation be contemporaneous, citing the Restatement (Second) of Contracts. *Meredith*, 826 F.2d 463, and the Ohio cases cited therein, and *Scioto Savings*, 1978 Ohio App. LEXIS 10229, however, expressly require that consent to a novation be contemporaneous. Perhaps subsequent conduct and circumstances may provide evidence, in certain instances, that such consent occurred at the time of the novation, but Ohio law is clear that for a novation to occur, the parties must all intend, at the time the novation occurred, to extinguish the prior obligation and replace it with a new one.

### 6. Plaintiffs Are Barred From Arguing The 1990 Assignment Gave Rise To Their Claims Due To Laches, Waiver, And Statute Of Limitations.

Plaintiffs cannot be permitted to now drastically hike Commonwealth's rent after doing nothing to enforce their alleged rights to payment in gold for almost a quarter century. Plaintiffs have waived the right to demand higher payments under the Lease by accepting, without objection, payments in the amount tendered. *EAC Props., LLC v. Brightwell*, No. 10AP-853, 2011 Ohio App. LEXIS 2021, at *15 (Ohio Ct. App. May 17, 2011). Indeed, in *Fay Corp.,* 682 F. Supp. at 1121, the District Court held that lessor "waived its right to rent escalation pursuant to the gold clause." Laches also prevents Plaintiffs from enforcing the alleged "gold clause" nearly a quarter century after it was allegedly revived. *State ex rel. Eaton Corp. v. Indus. Comm. of Ohio*, 686 N.E.2d 507 (Ohio 1997). Finally, Plaintiffs' claims that the 1990 Assignment constituted a novation are barred by the statute of limitations. Under Ohio law, an action upon a written contract must be brought within eight years. OHIO REV. CODE ANN. § 2305.06. Because the alleged novation occurred almost twenty-five years ago, any actions in connection therewith are time-barred.

### D. The 2013 Renewal Was Merely A Renewal Of The Pre-Existing Obligations—Not A New Obligation.

The Renewal is not a new obligation issued after 1977 because it was required by the terms of the Lease, did not operate to release prior lessees, and did not materially modify the Lease. Instead, the Renewal merely extended and continued the term of the Lease as the parties agreed in 1919.

### 1. The Terms Of Both The Lease And The Renewal Are Clear That The Renewal Is Not A New Obligation.

In the Renewal, the parties expressly agreed and acknowledged that the Lease required the extension of the term, noting that the Lease "is renewable forever" and "contemplates that

Lessors and Lessee will execute a renewal lease at the expiration of each ninety-nine (99) year term of the Lease." Doc. 7-4 at §§ (C) and (E). The Lease itself is a perpetual or permanent lease obligating the parties to extend its term every 99 years in perpetuity. Doc. 7-1 at 7. Even the language of the alleged "gold clause" is clear that the payment obligations created under the Lease, in 1919, are obligations "during the continuation of this lease and any renewal or renewals thereof…." Doc. 7-2 at § 1.

In the Renewal, the parties affirm that the Renewal does not constitute a new obligation, but rather that the original "Lease is *extended*…." Doc. 7-4 at § 1 (emphasis added). Further, the parties agree that "[t]his Renewal shall constitute the 'renewal lease' as ***contemplated by the Lease***." *Id.* at § 2 (emphasis added). Finally, the parties agree that "the Lease ***shall continue*** in full force and effect…." *Id.* at § 5 (emphasis added). There can be no doubt that the intent of the Renewal was not a new obligation, but rather an "exten[sion]" and "continu[ation]" of the existing Lease. *Id.* at §§ 1 and 5.

Of course, neither Nitschke nor any of the prior lessees were parties to the Renewal. The Lease did not require Nitschke to sign the Renewal because the Lease expressly provided it was only to be signed by "those then possessed of Lessees' ***rights*** in this lease." Doc. 7-1 at 7. By virtue of the 1990 Assignment, Nitschke assigned its rights to Commonwealth but remained obligated under the Lease.

Both the Lease and Renewal make clear that the Renewal is not a new obligation, but rather the fulfillment of an obligation under the 1919 Lease.

2.  ***The Renewal Is Not A Novation Because Prior Lessees Were Not Released Thereby.***

Even a renewal of a lease, especially where required by the terms of the lease, does not alone release the assignor in order to support an argument of novation. 49 AM. JUR. 2D *Landlord*

*and Tenant* § 443 (emphasis added) explains the concept as follows:

> Where a lease contains an option in the lessee's favor, to renew or extend the term, which is binding on the lessor upon the lessee's election to exercise it, the **lessee remains liable, under his covenant to pay rent, for rent during the extension or renewal, although he has assigned the lease and the option has been exercised by his assignee**. Since in such case the original term and the renewal or extended term are in legal effect a unit, no distinction can be drawn as to the lessee's liability based on the cessation of the original rental period.

Here, the extension of the term of the Lease through renewal was not an option, but a **requirement** under the terms of the Lease. Doc. 7-1 at 7. Therefore, Nitschke as assignor remains bound after the Renewal.

### 3. The Renewal Is Not A Material Modification That Would Transform It Into A New, Post-1977 Obligation.

The Lease Renewal did not materially modify the Lease in a manner that renders it a new obligation. Ohio law is clear that "[m]ere modification of an original contract will not suffice in establishing novation. Anything that still remains in effect of the original obligation prevents novation unless the contrary is particularly expressed or shown by the evidence." *Braun*, 1975 Ohio App. LEXIS 8224, at *9.

In *Miles v. Realty One*, No. 69506, 1996 Ohio App. LEXIS 1889, at *6-7 (Ohio Ct. App. May 9, 1996), the court held that an "amendment of some details of a contract while leaving undisturbed its general purpose constitutes a mere modification of the original contract and the latter remains in force as modified." In *Miles*, the amendments to the purchase contract at issue (1) extended the time for both providing a loan commitment and for closing the transaction, and (2) reduced the purchase price, yet the court found that the amendments did not constitute new contracts. *Id.* at *6.

In *Hagan*, 2013 Ohio App. LEXIS 5336 at *11, an Ohio appellate court held that a 1909

lease renewable for successive 99-year terms, with rent to be reset to market rates at the time of each renewal, is still deemed a pre-1977 obligation. In *Hagan*, the rental rate was reset in an arbitration proceeding in the course of the renewal in 2013, yet the court held that the obligations in the renewal lease remained unenforceable as they flowed not from the renewal, but from the original lease. *Id.*

Here, the only change brought about by the Renewal is a requirement that Lessor provide notice of default and an opportunity to cure to the mortgagee. Doc. 7-4 at §§ 1, 4. This minor change to the notice provision of the Lease is immaterial under any standard, especially when compared to the changes in *Miles* or *Hagan*. Therefore, the modifications in the Renewal are insufficient to transform it into an altogether new agreement.

*A.S. Abell Co. v. Firemen's Ins. Co.*, 49 A. 334 (Md. 1901), the primary authority cited by Plaintiffs in support of their argument that a renewal is a new obligation, is readily distinguishable from the present case. Doc. 21-1 at 26. While the lease in *A.S. Abell* "contain[ed] the usual covenant for renewal 'during the continuance of the demise so created,'" there is no evidence that the lease **required** renewal as does the Lease at issue here. *Id.* at 335. Additionally, and as further evidence that the renewal was not mandated, the parties did not renew the lease during its term but instead entered into "a new lease" twenty-six years later. *Id.* at 336. Therefore, it is neither surprising, nor particularly relevant, that the Maryland court in *A.S. Abell* applied Maryland law and concluded that the rights under the original lease had been extinguished. *Id.* at 337. Notably, the court's conclusion appears to be founded upon "the failure to renew during the continuance of the lease," not upon some broad-reaching principle that an extension of the term of a lease, mandated by the lease, represents a new obligation. *Id.*

The Renewal merely fulfilled the obligations set forth in the original Lease—extending

the term for another 99 years.  The minor revision to the notice provision does not transform the Renewal into a new lease.  Therefore, the Renewal is not a new obligation that may revive a "gold clause."

> **E.**    ***Neither Privity Of Contract Nor Privity Of Estate Constitute Obligations Issued After 1977.***

Plaintiffs' argument that mere privity of contract or privity of estate constitutes an obligation issued after 1977 thus reviving a gold clause has been soundly rejected by the Sixth Circuit and each and every court that has considered a "gold clause" case.  The Plaintiffs argue that *every* lease assignment and assumption brings the assignee into privity of contract and privity of estate with the lessor.  Doc. 21-1 at 22-23.

Not only do Plaintiffs offer no support for their argument that by becoming bound by *preexisting* obligations (through privity), one creates a *new* obligation, this reasoning runs counter to all gold clause and novation jurisprudence.  Indeed, if coming into privity of estate or contract alone constituted an obligation after 1977, then *every* assignment and assumption would result in the revival of the gold clause.  This notion is clearly contrary to the statute and the resultant case law.  Courts have uniformly held that an assignment alone is not a novation and will not constitute an obligation issued after 1977 necessary to revive a gold clause.  *See, e.g., 216 Jamaica*, 540 F.3d at 437.

In *216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, No. 1:06-CV-01288, 2007 U.S. Dist. LEXIS 48298, at *13 (N.D. Ohio July 2, 2007) (overturned by the Sixth Circuit without addressing the Court's findings regarding privity), the Northern District noted that the landlord "offered no authority for its argument that a preexisting, yet unenforceable, gold clause obligation issues anew when a party comes into privity of either contract or estate."  Likewise, no authority has been offered in support of this argument in Plaintiffs' MSJ.  Because courts,

including the Sixth Circuit, have held that an assignment alone will not revive a gold clause, privity of contract or privity of estate are not new obligations sufficient to revive a gold clause under the 1977 amendment.

## IV.     CONCLUSION

Because Plaintiffs cannot establish that any obligation to pay in gold under the Lease was issued after 1977—an essential element of both of their claims—their MSJ should be denied, and, because Plaintiffs bear the burden of proof on the issue of novation, it is Defendants that are entitled to summary judgment.

Respectfully submitted,

**/s/ Joseph F. Murray**
Joseph F. Murray, Trial Attorney (0063373)
MURRAY MURPHY MOUL + BASIL LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murray@mmmb.com

Stephen D. Williger (0014342)
Holly H. Little (0084054)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
Telephone: 216.566.5500
Fax: 216.566.5800
Email: Stephen.Williger@thompsonhine.com
        Holly.Little@thompsonhine.com

Robert Huff Miller (0076939)
ROBERT HUFF MILLER LLC
100 East Broad Street, 16th Floor
Columbus, OH 43215
Telephone: 614.384.5794
Facsimile: 614.441.9280
Email: rob@roberthuffmiller.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 15, 2015, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Peter A. Patterson
John D. Ohlendorf
Charles J. Cooper
David H. Thompson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
ppatterson@cooperkirk.com
johlendorf@cooperkirk.com
ccooper@cooperkirk.com
dthompson@cooperkirk.com

**/s/ Joseph F. Murray**
Joseph F. Murray